**IN THE UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF OHIO**

**EASTERN DIVISON**

| | | |
|---|---|---|
| GARY E. DANIELS, SR., | ) | CASE NO. 1:22-cv-01373-DCN |
| | ) | |
| Plaintiff, | ) | |
| | ) | DISTRICT JUDGE DONALD C. NUGENT |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| CORECIVIC, INC., ET AL., | ) | REUBEN J. SHEPERD |
| | ) | |
| | ) | |
| Defendants. | ) | **REPORT AND RECOMMENDATION** |

## I.    Introduction

Before the Court is a motion for summary judgment filed by Defendants CoreCivic, Inc. ("CoreCivic"), Shannon Swanson, M.D. ("Dr. Swanson"), and Warden Douglas Fender ("Warden Fender") (collectively, "Defendants"). (ECF Doc. 46). Because there are no genuine issues of material fact, I recommend the District Court grant Defendants' motion for summary judgment.

## II.    Procedural History

On August 2, 2022, Plaintiff Gary E. Daniels, Sr. ("Daniels"), then proceeding *pro se*, filed a 42 U.S.C. § 1983 action in this Court. (ECF Doc. 1). He filed an amendment to this complaint on January 2, 2023 to reflect a corrected name for Defendant CoreCivic. (ECF Doc. 11).

1

On February 9, 2023, Daniels requested, and on July 28, 2023, was appointed pro bono counsel. (ECF Docs. 23, 25; non-document entry of July 28, 2023). On September 29, 2023, now proceeding with counsel, Daniels filed a First Amended Complaint against all defendants in the case. (ECF Doc. 27). In it, he (1) alleged a violation of 42 U.S.C. § 1983 for failing to timely treat his enlarged prostate, which later developed into prostate cancer, violating his right to be free from cruel and unusual punishment under the Eighth Amendment (*id.* at ¶¶ 33-37); (2) sought a permanent injunction ordering Defendants Core Civic and Dr. Swanson to seasonably address inmates' serious medical needs without unnecessary delay (*id.* at ¶¶ 38-43); and (3) sought a declaratory judgment under 28 U.S.C. § 2201 against all defendants (*id.* at ¶¶ 44-48).

On July 8, 2023, Defendant Annette Chambers-Smith filed a motion to dismiss (ECF Doc. 33), with Daniels agreeing with the dismissal on December 5, 2023 (ECF Doc. 35), and the Magistrate Judge issuing a report and recommendation that she be dismissed on December 27, 2023 (ECF Doc. 36). On January 18, 2024, the District Judge adopted the report and recommendation, and Defendant Chambers-Smith was dismissed. (ECF Docs. 39, 40).

On April 2, 2024, the matter was reassigned and referred to me for general pretrial supervision, including preparation of a Report and Recommendation on any dispositive motions. (Non-document entry of April 2, 2024). On April 3, 2024, Daniels' pro bono counsel moved to withdraw from his case (ECF Doc. 44), which I granted on April 9, 2024 (ECF Doc. 45).

On May 6, 2024, the remaining Defendants filed the present motion for summary judgment. (ECF Doc. 46). Daniels filed a brief in opposition, which was received on May 20, 2024. (ECF Doc. 48). Defendants filed a reply on June 4, 2024. (ECF Doc. 50).

III.    **Factual Background**[1]

Daniels is a prisoner of the State of Ohio in the custody of the Ohio Department of Corrections and is currently confined in Lake Erie Correctional Institution ("LaECI"), run by private prison corporation, CoreCivic. (Compl., ECF Doc. 27, ¶¶ 6, 9). Defendant Fender is the Warden of LaECI, and is responsible for its operation and the welfare of its inmates. (*Id.* at ¶ 8). Dr. Swanson is responsible for the medical care of the inmates housed at LaECI. (*Id.* at ¶ 10).

Central to this case is Daniels's enlarged prostate, which he alleges was not treated in a timely manner, causing him to develop prostate cancer and suffer continuing injury, amounting to a violation of the Eighth Amendment. (*Id.* at ¶¶ 2, 3).

In June 2016,[2] Daniels began complaining of low urinary symptoms. (ECF Doc. 46-2, CC-DANIELS000053-54). He was referred to urologist Mark Cabelin, M.D., at the Ashtabula County Medical Center, and underwent a urodynamic and uroflow study on August 2, 2016. (*Id.* at CC-DANIELS000061-66). The study revealed he had obstructive and irritative urinary symptoms caused by an enlarged prostate. (Dr. Howard Tay Affidavit, ECF Doc. 46-5, p. 5). Prior to his retirement, Dr. Cabelin prescribed Flomax (alpha blocker) and Detrol (anticholinergic), as well as recommended conducting an MRI, with the possibility of a potential TURP (transurethral resection of the prostate) and biopsy. (*Id.*; *see also* ECF Doc. 46-2 at CC-

---

[1] The parties have not submitted stipulated facts to the Court. Therefore, the facts recited here are those presented by the parties in their briefings.

[2] Daniels presents his medical treatment claim as one sounding in the Eighth Amendment's prohibition on cruel and unusual punishment, which generally forecloses a medical malpractice claim. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Nonetheless, to the extent that Daniels asserts a medical malpractice claim against Defendants, such a claim must be brought within four years after the occurrence of the act or omission constituting the alleged basis of the medical claim. Ohio Rev. Code § 2305.113(C). Daniels filed his Complaint on August 4, 2022; therefore, any claim accruing before August 4, 2018 is time-barred. Facts presented from before this period are provided for completeness.

DANIELS000069-70). Daniels did not wish to take the Flomax and Detrol because he did not want to mask anything before getting full test results, and he wished to discuss his case with the new urologist prior to any procedure. (ECF Doc. 46-2, CC-DANIELS000069-70). On August 3, 2016, he was seen by Dr. Swanson while at LaECI for review of his bladder function testing; he had a current workup for an elevated PSA (prostate specific antigen) of 9.8. (*Id.* at CC-DANIELS000058-60).

On August 16, 2016, Daniels underwent an MRI of the pelvis which confirmed an enlarged prostate (4.9 x 4 x 4 cm), and a 0.6 cm lesion in the left mid posterolateral peripheral zone, and other findings suspicious for prostatitis elsewhere in the peripheral zone. (*Id.* at CC-DANIELS000112-115).

On October 21, 2016, Daniels attended an appointment with Carrie Aiken, CNP at LaECI for follow up on his hypertension. (ECF Doc. 46-2, CC-DANIELS000109). NP Aiken noted that Daniels continued to have lower urinary tract symptoms despite consistently taking Flomax and Detrol. (*Id.* at CC-DANIELS000109-111). Daniel complained of nausea on these medications and NP Aiken recommended taking them with food. (*Id.*). She referred Daniels for follow up with urologist Dr. Zippe and recommended continued medication compliance. (*Id.*) NP Aiken also ordered lab work, which on October 25, 2016 revealed a PSA of 5.8. (*Id.* at CC-DANIELS000100).

A pelvic MRI performed on October 31, 2016 revealed that his prostate size was 5.4 x 4.0 x 4.1 cm, corresponding to a volume of approximately 42 cc. Likely prostatitis was noted in the

peripheral zone, and there was a lesion noted in the left mid posterolateral peripheral zone laterally. (*Id.* at CC-DANIELS000130-32).

On November 2, 2016, Daniels met with Dr. Swanson for post-MRI follow up. (*Id.* at CC-DANIELS000133-35). He complained of severe side effects from the Flomax and Detrol and discontinued both medications. (*Id.*). Dr. Swanson noted that Daniels had follow up with urology scheduled. (*Id.*). Daniels returned for another appointment with NP Aiken on November 16, 2016, complaining of continued urinary incontinence. (*Id.* at CC-DANIELS000140-41). NP Aiken recommended he restart Detrol and confirmed the upcoming urology consult. (*Id.*). Daniels returned to NP Aiken on December 12, 2016, again complaining of urinary incontinence. (*Id.* at CC-DANIELS000149-50). NP Aiken again reminded him to restart Detrol and Flomax and ordered lab work. (*Id.*). Lab results from December 15, 2016 revealed a PSA of 6.3. (*Id.* at CC-DANIELS000146).

On January 4, 2017, Daniels met with urologist, Craig Zippe, M.D., for evaluation of his elevated PSA levels. (*Id.* at CC-DANIELS000178-81). Dr. Zippe recommended a prostate biopsy, including taking the antibiotic ciprofloxacin. (*Id.* at CC-DANIELS000178). Daniels refused to take the ciprofloxacin on February 27, 2017 as recorded in a refusal of medication form.[3] (*Id.* at CC-DANIELS000207). He also refused to complete the biopsy as recorded on a March 15, 2017 Release of Responsibility form. (*Id.* at CC-DANIELS000210). The form states Daniels refused to go to the appointment, stating "tell him [urologist] I'm not coming." (*Id.*). It also states that Daniels was informed of and understood the risks of refusing treatment: "Elevated PSA may be [the] result of prostate cancer and may lead to death., IM verbalizes

---

[3] Daniels did not sign the release of responsibility form. On the signature line, it states "Pt refuses to sign 'I'm not signing anything.' 'I'm not going.' Witnessed by ALP and Nurse." (ECF Doc. 46-2, CC-DANIELS000210).

understanding but refuses to sign 'Release of Responsibility' for myself because he already signed for nursing staff at 5:30am." (*Id.*).

Routine lab work continued to reveal elevated PSA levels, with tests conducted on August 9, 2017 revealing a PSA of 6.8; November 8, 2017 revealing a PSA of 5.9; April 16, 2018 revealing a PSA of 7.8; and September 11, 2018 revealing a PSA of 6.8. (*Id.* at CC-DANIELS000237, 295, 355, 412).

On September 19, 2018, Daniels attended an appointment with Dr. Swanson for follow up of his elevated PSA. (*Id.* at CC-DANIELS000414-15). Dr. Swanson noted Daniels had several findings of elevated PSAs and that he was scheduled for a prostate biopsy several years ago but had declined. (*Id.*). Dr. Swanson indicated Daniels was agreeable to a prostate ultrasound at that time. (*Id.*). At a three-month routine appointment on October 23, 2018, Zorka Gedeon, CNP, noted Daniels's elevated PSA levels, indicated he was on Hytrin for his prostate issues, and that he had been on Flomax but refused that medication due to side effects. (*Id.* at CC-DANIELS000419-22). NP Gedeon recounted the following:

> We again revisited the issue of the chronic elevation in PSA and he says he will still refuse any urology consult/biopsy even if his PSA goes up, I explained to him that this could be prostate cancer and he states that he does not care. It looks like Dr. Swanson ordered an ultrasound recently which he also states that he will refuse. I explained that if this is cancer that he could die and he states "I'm going to die eventually anyway."

(*Id.* at CC-DANIELS000419). On October 31, 2018, Dr. Swanson recorded that Daniels was taken in for the prostate ultrasound he had agreed to undergo the month before, but that he refused the ultrasound upon arrival to medical. He stated he had changed his mind, and he verbalized understanding of the risks. (*Id.* at CC-DANIELS000427-28). Release of Responsibility forms dated October 31, 2018 indicate Daniels refused the ultrasound despite

being informed of risks including increased PSA, prostate cancer, and death.[4] (*Id.* at CC-
DANIELS000425-26).

Lab work from April 5, 2019 indicated increased PSA of 7.7. (*Id.* at CC-
DANIELS000486). At follow up on April 13, 2019, NP Aiken noted Daniels was not taking his
prostate medication and continued to have elevated PSA levels. (*Id.* at CC-DANIELS000488).
After discussion, Daniels stated he wished to see the urologist and undergo testing; NP Aiken
advised him she would order a consult. (*Id.*). On June 6, 2019, Daniels met with urologist
Thomas Picklow, M.D., who prescribed Proscar and recommended a prostate biopsy due to
prostate cancer risk. (*Id.* at CC-DANIELS000506-08). Daniels was agreeable to the prostate
biopsy. (*Id.*).  A handwritten note stating "if PSA is normal no biopsy needed. Will try Proscar for
30 days, then recheck PSA" is included at the bottom of the visit record. (*Id.*). Later testing
revealed lowered PSA levels of 6.4 on July 15, 2019 (*id.* at CC-DANIELS000534), 3.3 on
October 7, 2019 (*id.* at CC-DANIELS000565), and 4.2 on October 14, 2019 (*id.* at CC-
DANIELS000584-85).

At an April 21, 2020 visit with NP Aiken, it appears Daniels continued to take Proscar
daily. (*Id.*at CC-DANIELS000757-761). November 24, 2020 treatment notes indicate Daniels
was started on Terazosin 2 mg by Dr. Swanson starting on October 9, 2020. (*Id.* at CC-
DANIELS000819). However, in 2021, Daniels again began to have elevated PSA levels, with

---

[4] The forms indicate Daniels refused to sign the Release of Responsibility forms. (ECF Doc. 46-
2, CC-DANIELS000425-26).

labs on March 9, 2021 revealing a PSA of 5.9, and September 7, 2021 revealing a PSA of 8.8. (*Id.* at CC-DANIELS000881, 1071).

On September 11, 2021, Dr. Swanson referred Daniels to a urologist for his elevated PSA levels and on October 25, 2021, Daniels was evaluated by urologist Rashed Ghandour, M.D. (*Id.* at CC-DANIELS001124-25). Dr. Ghandour reviewed Daniels's symptoms and elevated PSA levels, and recommended a prostate MRI, restarting Flomax, and discontinuing Terazosin (Hytrin), with follow up in eight weeks to discuss potential biopsy depending on the results of the MRI. (*Id.* at CC-DANIELS001118-21, 1134). A December 23, 2021 prostate MRI revealed a prostate weight of 40 gms and bilateral diffuse PI-RADS 2 category changes with an 8 mm PI-RADS 3 category lesion in the left mid peripheral zone. (ECF Doc. 46-3 at CC-DANIELS001167-68).

Labs from January 2022 revealed a PSA of 9.9. (*Id.* at CC-DANIELS001398). On February 15, 2022, Daniels underwent a prostate biopsy, which revealed adenocarcinoma of the prostate involving both lobes. (*Id.* at CC-DANIELS001272-74). On March 7, 2022, Dr. Ghandour reviewed the biopsy results indicating Gleason 7 prostate cancer and discussed available treatments, including active surveillance, surgical removal of the prostate, and radiation therapy. (*Id.* at CC-DANIELS001277). Daniels verbalized understanding of his options and elected to proceed with a consultation for radiation therapy. (*Id.*).

On March 28, 2022, Daniels was evaluated by radiation oncologist, Nicholas Zaorsky, M.D., M.S., who reviewed Daniels's history and treatment options; ultimately Dr. Zaorsky recommended external beam radiation therapy and obtaining a total body bone scan to further evaluate disease progression. (*Id.* at CC-DANIELS001429-36). He also recommended Daniels consider transurethral resection of the prostate prior to starting radiation therapy. (*Id.* at CC-

DANIELS001435). The total body bone scan performed on April 11, 2022 revealed no evidence of osseous metastatic disease. (*Id.* at CC-DANIELS001706-08).

Daniels received external beam radiation therapy beginning on May 4, 2022. (*Id.* at CC-DANIELS001846-002299, ECF Doc. 46-4, CC-DANIELS2300-2386). He received daily treatments, Monday through Friday. (*See, e.g.,* ECF Doc. 46-3 at CC-DANIELS001861). He was noted to be feeling well and doing well with his radiation treatment. (*See, e.g.*, *id.*). He complained of minor side effects, including feeling a burning sensation from the radiation therapy, urinary issues, and hip pain. (*Id.* at CC-DANIELS001941, 2014, 2232 and ECF Doc. 46-4, CC-DANIELS002421). Daniels completed his radiation treatment on May 27, 2022. (ECF Doc. 46-4, CC-DANIELS002376-78).

A routine blood test on September 19, 2022 revealed a PSA of 0.1. (ECF Doc. 46-4, CC-DANIELS002432). On September 28, 2022, NP Aiken noted that radiation/oncology felt that Daniels no longer needed follow up with their office and recommended monitoring PSA levels every six months. (*Id.* at CC-DANIELS002448). At an October 3, 2022 visit, Dr. Swanson placed Daniels's prostate cancer in remission and recommended continuing to follow PSA levels. (*Id.* at CC-DANIELS002447). On November 3, 2022, Daniels received a 6 month-dose of Lupron (androgen deprivation therapy) for the continued treatment of his prostate cancer. (*Id.* at CC-DANIELS002465).

Defendants present an affidavit from urologist Howard P. Tay, M.D., F.A.C.S. (ECF Doc. 46-5). After reviewing the medical record, Dr. Tay asserts the care provided to Daniels was within the standard of care regarding the following conditions: elevated PSA, prostate enlargement along with lower urinary tract voiding symptoms, and prostate carcinoma. (*Id.* at p. 8). In Dr. Tay's opinion, Daniels received timely and appropriate care, and received appropriate

9

consultations as to his treatment options. (*Id.*). According to Dr. Tay, based on the metastatic workup for Daniels's prostate cancer, there were no signs that the cancer was in an advanced stage; it is speculative that an earlier biopsy would have changed his prognosis. (*Id.*).

Daniels, for his part, does not provide specifics as to any facts contained in his medical record. Rather, in his objection to Defendants' motion for summary judgment, he states, "I read the care I got and I can't say too much, but I ask the Court to Debunk-expose the false statements [and] allow[] this evidence be used for a jury trial as well." (ECF Doc. 48, p. 1). And in a document titled "medication plan" dated June 10, 2024, Daniels presents the following: Dr. Swanson tried several different medications to decrease the size of his enlarged prostate, but all had an intolerable effect on his system. (ECF Doc. 51, p. 1). The size of his prostate would decrease with medication, and increase when he had to stop the medications. (*Id.*). He wished to know with certainty if his enlarged prostate had cancer or not, and contends that Dr. Swanson is responsible for the false statements contained in his medical history. (*Id.* at pp. 1-2).

I also note that on June 8, 2022, Daniels submitted an internal grievance regarding the delay in care for his prostate. (ECF Doc. 46-6). In it, he states that he was told by multiple officers that the long delay when he was scheduled for the first biopsy was because Ashtabula Medical Center stopped accepting inmates from LaECI due to it not paying its medical bills on time. (*Id.* at p. 2). His grievance included the following statements: "ough [*sic*] time to put all the truth in in one session! this is about core civic delayiny serst medcial [*sic*] condition that cause cancer in my Prostate in 2017 from ASTABULA MEDICAL CENTER. see Complaint #0622000 786, 789, 792. stg ALLEN AND SGT. SLEBODNICK WERE THE TRAN. OFFICER IN 2-17 AND 2022." and " I still dont know why it took so long to give me a biospy [*sic*] from my first

appointment in 2017. or how can I move forward! see # 3 of the informal complaint! the only

session I used." (*Id.*). The grievance was closed after appeal on August 1, 2022. (*Id.*).

## IV.     Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed. R.

Civ. P. 56(a). The moving party must demonstrate "the basis for its motion, and identify[] those

portions of the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue

of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation omitted).

The nonmoving party may not simply rely on the pleadings, but "must set forth specific facts

showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

250 (1986) (internal quotation omitted). A reviewing court must determine whether the evidence

that the nonmoving party relies upon "presents sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477

U.S. at 251-52.

In evaluating the evidence presented on a summary judgment motion, the reviewing court

must draw all reasonable inferences in favor of the nonmoving party. *Id.* at 255. Nevertheless, a

court need not accept unsupported or conclusory statements as true.  *See Alexander v.*

*CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) ("Conclusory statements unadorned with

supporting facts are insufficient to establish a factual dispute that will defeat summary

judgment."). The non-moving party must present specific facts to demonstrate there is a genuine

issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).

## V.     Discussion

### A.     Section 1983 Liability

Daniels brings his causes of action pursuant to 42 U.S.C. § 1983, claiming violations of his civil rights as guaranteed by the Eighth Amendment to the United States Constitution. (ECF Doc. 27, ¶ 1). He brings suit against each Defendant in their individual and in their official capacities. (*Id.* at ¶ 11). He argues Defendants acted under the color of state law and violated his constitutional right to be free from cruel and unusual punishment, in that he was denied timely medical care. (*Id.* at ¶¶ 33-48). In their brief, Defendants present argument that Daniels has not stated a § 1983 claim against them in their official capacities because he has not sufficiently alleged facts meeting the required showing of liability under *Monell* or under the Sixth Circuit's standard as stated in *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). (ECF Doc. 46, pp. 21-23, p. 21 n. 1). Defendants also state that Daniels has failed to state a § 1983 claim against Warden Fender in his official capacity, and that there was no deliberate indifference to his serious medical need by Defendants. (*Id.* at pp. 23-25).

### 1.     Official Capacity

I first note that CoreCivic is a private prison that operates LaECI on behalf of the State of Ohio. *See Whitson v. CoreCivic*, No. 3:17-CV-00951, 2017 WL 3025599, at *2 (M.D. Tenn. July 17, 2017) (describing CoreCivic as "a Nashville-based private prison company."). Douglas

Fender was the Warden at LaECI, and Dr. Swanson was a medical provider at LaECI during the period at issue. (*See generally* ECF Doc. 46).

"A section 1983 claimant must show 1) the deprivation of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law." *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996) (internal quotations omitted). As a private prison operating on the behalf of the State of Ohio, Defendants may be considered as "'acting under color of state law' in that they were performing the 'traditional state function' of operating a prison" for purposes of analyzing § 1983 liability. *Id.* Therefore, CoreCivic and the individual defendants are amenable to suit under § 1983.

However, § 1983 liability cannot be imposed upon CoreCivic solely on the basis of respondeat superior. *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 80-81 (6th Cir. 1995). Rather, Daniels must demonstrate injury caused pursuant to some official policy or custom. *Monell*, 436 U.S. at 691. Daniels has not pointed to any official policy or custom on CoreCivic's part that caused his alleged lack of medical treatment for his prostate. Accordingly, he has no claim against CoreCivic. *See Thomas v. Coble*, 55 F.App'x 748, 748-49 (6th Cir. 2003). Following that thread, with no claim as to CoreCivic official policies, his claims with respect to Warden Fender and Dr. Swanson in their official capacities as CoreCivic employees also fail.

Therefore, Daniels may not maintain his suit for damages against Defendants in their official capacities.

### 2. Individual Capacity: Count One

In Count One of his Amended Complaint, Daniels alleges a Section 1983 violation, stating that Defendants failed to seasonably treat or otherwise procure treatment for his prostate, causing his condition to develop into prostate cancer and causing him to suffer continuing injury,

including lingering urination issues and a dry cough, among other complications. (ECF Doc. 27, ¶¶ 35, 37). Furthermore, Defendants' inaction and/or inadequate oversight violated Daniels's constitutional right to be free from cruel and unusual punishment under the Eighth Amendment. *Id.* at ¶ 36).

Defendants respond that they were not deliberately indifferent to Daniels's medical needs, and that no violation occurred. (ECF Doc. 46, pp. 8, 18-20). In support, they provide Daniels's medical record during the period at issue (ECF Docs. 46-1, 46-2, 46-3, 46-4), and provide a medical expert's opinion as to the care Daniels received for his prostate issues (ECF Doc. 46-5). These records demonstrate Daniels received appropriate care, and that any delay in receiving treatment for his enlarged prostate, and any cancer diagnosis that may have resulted, stemmed from Daniels's refusal of treatment. (ECF Doc. 46, p. 8). Defendants allege Daniels has not demonstrated that they were deliberately indifferent to his serious medical needs, and that Daniels has not carried his burden of proof to show otherwise. (*Id.* at pp. 18-20). Without more, Daniels's claim fails.

42 U.S.C. § 1983 provides that any person who, under color of law, subjects any citizen of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution, shall be liable to the injured party. In other words, to prove a claim under Section 1983, a plaintiff must demonstrate "that he was deprived of a right secured by the Constitution or laws of the United States, and that he was subjected to or caused to be subjected to this deprivation by a person acting under color of state law." *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir.1994).

In its prohibition against "cruel and unusual punishments," the Eighth Amendment imposes the duty on prison officials to "provide humane conditions of confinement; prison

officials must ensure that inmates receive adequate food, clothing, shelter, and medical care[.]" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). As a result, a prison official's "deliberate indifference" to the serious medical needs of inmates violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Farmer*, 511 U.S. at 828. But a prison official's inadvertent failure to provide adequate medical care, or a complaint that a physician was negligent in diagnosing or treating an inmate's medical condition, does not state a valid claim under the Eighth Amendment. *Estelle*, 429 U.S. at 106. Furthermore, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

"The Eighth Amendment's deliberate indifference framework includes both an objective and subjective prong." *Wilson v. Williams*, 961 F.3d 829, 839 (6th Cir. 2020), citing *Farmer*, 511 U.S. at 834 *and Helling v. McKinney*, 509 U.S. 25, 35 (1993). Thus, to state a cognizable claim, the inmate must show objectively "that he is incarcerated under conditions posing a substantial risk of serious harm" and subjectively, that an "official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 834, 837; *see also Wilson*, 961 F.3d at 840. "To satisfy the subjective component, the defendant must possess a 'sufficiently culpable state of mind,' rising above negligence or even gross negligence and being 'tantamount to intent to punish.'" *Broyles v. Corr. Med. Servs., Inc.*, 478 F. App'x 971, 975 (6th Cir. 2012), quoting *Horn v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir.1994).

With this, the Eighth Amendment requires a showing of more than mere negligence and forecloses claims alleging merely medical malpractice. *See Kirkland v. ODRC*, No. 4:23-cv-00305, 2023 WL 8807240, at *6 (N.D. Ohio Dec. 19, 2023). "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. "To the extent a plaintiff complains 'solely [about] the lack of diagnosis and inadequate treatment of" the injury or ailment and takes the position 'that more should have been done by way of diagnosis and treatment' (including 'suggest[ing] a number of options that were not pursued'), that question 'is a classic example of a matter for medical judgment.'" *Barrett v. Carter*, 823 F. App'x 386, 395 (6th Cir. 2020), quoting *Estelle*, 429 U.S. at 107. As such, "allegations of medical malpractice or negligent diagnosis and treatment generally fail to state an Eighth Amendment claim of cruel and unusual punishment." *Broyles*, 478 F. App'x 971, 975, citing *Estelle*, 429 U.S. at 106. Therefore, "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Broyles*, 478 F. App'x at 975.

For Daniels to succeed in his individual-capacity claims against Defendants, he must demonstrate each defendant's personal involvement in the alleged unconstitutional conduct "Persons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior." *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012). Personal liability "must be based on the actions of that defendant in the situation that the defendant faced, and not based on any problems caused by the errors of others[.]" *Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991). Section 1983 liability cannot arise under a theory

of *respondeat superior* or vicarious liability. *Monell v. Dept. of Soc. Svcs.* 436 U.S. 658, 692 (1978).

However, even construing facts in his favor as the non-moving party, Daniels has not presented facts sufficient to show any defendant's personal involvement in unconstitutional conduct. In his brief in opposition, Daniels makes unsupported allegations that an assistant working in Warden Fender's employ had "made false and misleading statements[.]" (ECF Doc. 48, p. 1). He alleges this assistant of Warden Fender included at the top of a page of the record, without specifying, that he "Told Dr. Swanson he didn't want it (referring to the biopsy) because 'it went down' (meaning enlarge [*sic*] prostate) She start with 'told he needed prostate biopsy.'" (*Id.*). This, however, is insufficient to demonstrate CoreCivic, Warden Fender, or Dr. Swanson's personal involvement. Nor does it allege facts rising to unconstitutional conduct.

Rather, the medical record provided by Defendants demonstrates that Daniels received regular care for his enlarged prostate from providers within the prison system, as well as care outside the facility from specialists. For example, after complaining of low urinary symptoms in 2016, he was referred to a urologist and received diagnostic testing to confirm he had an enlarged prostate. (ECF Doc. 46-2, CC-DANIELS000053-54, 61-66, ECF Doc. 46-5, p. 5). That urologist prescribed Flomax, Detrol, and recommended conducting an MRI, with the possibility of a potential TURP (transurethral resection of the prostate) and biopsy. (ECF Doc. 46-2, CC-DANIELS000069-70, 112-15, 130-32). Daniels was not compliant with taking the Flomax or the Detrol. (*Id.* at CC-DANIELS000149-50). Daniels was scheduled for a prostate biopsy on March 15, 2017, but refused the treatment at that time. (*Id.* at CC-DANIELS000178, 210). The forms provided by Defendants demonstrate that Daniels was informed of the risks of not proceeding with the prostate biopsy, including the risk of prostate cancer: "Elevated PSA may be [the] result

of prostate cancer and may lead to death, IM verbalizes understanding but refuses to sign 'Release of Responsibility' for myself because he already signed for nursing staff at 5:30am." (*Id.* at CC-DANIELS000210). Despite refusing the biopsy, Defendants continued to monitor Daniels's PSA levels and offer treatment, including Hytrin, Flomax, and a prostate ultrasound. Nonetheless, Daniels refused treatment in October 2018 despite being informed of the risks of prostate cancer. (*Id.* at CC-DANIELS000419-28).

Finally, in June 2019, Daniels met with a third urologist, who prescribed Proscar and again recommended a prostate biopsy. (*Id.* at CC-DANIELS000506-08). After a period of lowered PSA levels while on Proscar, Daniels's PSA levels began to rise again in late 2021. (*Id.* at CC-DANIELS000881, 1071). He was treated by another urologist, Dr. Ghandour, who recommended a prostate MRI, restarting Flomax, and discontinuing Terazosin (Hytrin), with follow up in eight weeks to discuss potential biopsy depending on the results of the MRI. (*Id.* at CC-DANIELS001118-21, 1134). Finally, on February 15, 2022, Daniels submitted to a prostate biopsy, which revealed adenocarcinoma of the prostate involving both lobes. (*Id.* at CC-DANIELS001272-74). Daniels, with consultation from a radiation oncologist, elected to proceed with external beam radiation therapy for treatment of his prostate cancer, but declined transurethral resection of the prostate. (*Id.* at CC-DANIELS001429-36). Daniels received external beam radiation therapy Monday through Friday in May 2022. (*Id.* at CC-DANIELS001846-002299, ECF Doc. 46-4, CC-DANIELS2300-2386). By October 2022, Daniels's prostate cancer was considered in remission and required only routine monitoring of PSA levels every six months. (ECF Doc. 46-4, CC-DANIELS002447-48).

18

In addition, Defendants present an affidavit from a urologist stating that Daniels received timely and appropriate care, and that it is speculative that an earlier biopsy would have changed his prognosis. (ECF Doc. 46-5).

Daniels does not specifically refute this evidence. Indeed, in his response to the present Motion for Summary Judgment, he states "I read the care I got and I can't say too much." (ECF Doc. 48, p. 1). Instead, he asks the court to "debunk expose the false statements" without clarifying what he is referring to as false or providing evidence as to the falsity of the records provided by Defendants. (*Id.*).

Daniels has not established a question of material fact sufficient to overcome Defendants' Motion for Summary Judgment. Even assuming for the sake of argument that Daniels has established the objective component demonstrating his enlarged prostate was a sufficiently serious medical need, he has not shown subjectively that Defendants' conduct was of the type that rises to the level of an Eighth Amendment violation. Rather, the evidence here demonstrates that the officials advised Daniels of the need for care and were prepared to provide it to him, but Daniels chose not to take advantage of the treatment available when it was first offered.

With this review, it is clear that Daniels has not shown that Defendants, in their individual capacities, had a culpable state of mind tantamount to an intent to punish, or that the delay in treatment rose to a constitutional violation. *Broyles*, 478 F. App'x at 975. I therefore recommend summary judgment be granted to Defendants as to Count One.

### 3.    Count Two: Permanent Injunction

Next, Daniels seeks a permanent injunction ordering Defendants Core Civic and Dr. Swanson to seasonably address inmates' serious medical needs without unnecessary delay.

(Amended Compl., ECF Doc. 27, ¶¶ 38-43). Defendants assert Daniels cannot show a likelihood of success on the merits and request summary judgment in their favor. (ECF Doc. 46, pp. 25-27).

The standard for a permanent injunction is the same as a preliminary injunction, except that for a preliminary injunction the plaintiff must show a likelihood of success on the merits and for a permanent injunction, the plaintiff must show actual success. *ACLU of Ky. v. McCreary County, Ky.*, 607 F.3d 439, 445 (6th Cir. 2010), quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987).  "[A] party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer continuing irreparable injury for which there is no adequate remedy at law." *ACLU of Ky.*, 607 F.3d at 445 (internal quotations and marks omitted).

District courts assess four factors in analyzing a preliminary injunction issue:

> (1) whether the plaintiff has a strong likelihood of succeeding on the merits;
> (2) whether the plaintiff will suffer irreparable injury absent the injunction;
> (3) whether issuing the injunction will cause substantial harm to others; and
> (4) whether the public interest will be furthered by the issuance of the injunction.

*Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Id.*

Despite his allegations to the contrary, as discussed above, Daniels cannot establish that he suffered a constitutional violation. Therefore, he fails the first prong of the test for issuing a permanent injunction, as the Sixth Circuit has outlined in *Gonzales*. This is fatal to his request in Count Two and analysis of the three remaining factors will not save this claim. I decline to recommend the District Court issue a permanent injunction.

I therefore continue in my recommendation that the District Court grant Defendants' motion for summary judgment.

### 4.      Count Three: Declaratory Judgment

In Count Three, Daniels requests a declaratory judgment requesting this Court "declare that Defendants' conduct violated the United States Constitution." (Compl., ECF Doc. 27, ¶ 47). Defendants oppose in a footnote, stating "Plaintiff's Count III seeks a 'declaration by this Court of the unconstitutionality of Defendants' conduct.' Because there was no constitutional violation and because the requested relief is not the kind contemplated by 28 U.S.C. § 2201, Defendants should be granted summary judgment in their favor on this claim." (ECF Doc. 46, p. 24, n.2 (internal citations to the record omitted)).

I agree with Defendants that no unconstitutional conduct by CoreCivic, Warden Fender, or Dr. Swanson has occurred that would warrant a declaratory judgment by this Court.

I therefore recommend the District Judge grant summary judgment to Defendants as to Count Three.

## VI.    Conclusion

For the foregoing reasons, I recommend the District Court GRANT Defendants' motion

for summary judgment and dismiss this case in its entirety.


Dated: September 25, 2024

Reuben J. Sheperd
United States Magistrate Judge


## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).